IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. __:__-cv-_____-__

| | | |
|---|---|---|
| MELCHOR LOPEZ-SANCHEZ, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| FORTINO RAMIREZ BAUTISTA, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

## **PRELIMINARY STATEMENT**

1. This is an action by Melchor Lopez-Sanchez ("Plaintiff"), a foreign migrant agricultural worker who lawfully entered the United States pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program") to perform labor in agriculture in North Carolina for farm labor contractor, Fortino Ramirez Bautista ("Defendant"), for various farming operations in and around southeastern North Carolina during the 2022 agricultural season.

2. Defendant Fortino Ramirez Bautista used a recruitment agent in Mexico to entice Plaintiff to commit to paying a large recruitment fee and agree to pay an exorbitant "breach fee" deposit for the opportunity to work lawfully in the U.S., using false promises about the wages and working conditions that would be provided.

3. The defendant labor contractor's fraudulent recruitment scheme left Plaintiff in crippling debt resulting from the unlawfully charged recruitment fees and for expenses Defendant and his agents required Plaintiffs to pay to travel to work for him on North Carolina farms.

1

4. After Plaintiff departed his hometown in Mexico to travel hundreds of miles to North Carolina, the Defendant then underpaid him for his work, exploited Plaintiff's isolation and indebtedness, confiscated his passport, and issued threats of harm to cultivate a climate of fear in an attempt to compel Plaintiff's labor against his will at various farms.

5. Plaintiff brings this action against Defendant to assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1, *et seq.* ("NCWHA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.* ("TVPRA"), and the North Carolina common law of contracts.

6. Plaintiff seeks back wages, liquidated, compensatory, and punitive damages, pre- and post-judgment interest, cost of the action, attorneys' fees, and other appropriate relief to make themselves whole for damages suffered due to the Defendant's violations of law.

## JURISDICTION

7. This Court has jurisdiction over this matter pursuant to:

    a. 28 U.S.C. § 1331 (Federal Question);

    b. 28 U.S.C. § 1337 (Interstate Commerce);

    c. 29 U.S.C. § 216(b) (FLSA);

    d. 18 U.S.C. § 1595(a) (TVPRA); and

    e. 28 U.S.C. § 1367 (Supplemental Jurisdiction).

8. This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiff's FLSA and TVPRA claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

9. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

2

**VENUE**

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because, at all times relevant to this Complaint, Defendant's regular and substantial business activities occurred in Sampson County, Bladen County, and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiff's claims were committed within the jurisdiction of the Eastern District of North Carolina.

**PLAINTIFF**

11. Plaintiff Melchor Lopez-Sanchez is a citizen of Mexico who was admitted to the U.S. in 2022 on a temporary basis with a visa issued pursuant to the H-2A Program to perform agricultural labor in 2022 for Defendant in or around Sampson County, Bladen County, and surrounding counties in North Carolina.

12. At all times relevant to this Complaint, Defendant employed Plaintiff to perform agricultural and related work for Defendant in or around Sampson County, Bladen County, and surrounding counties in North Carolina, within the meaning of 29 U.S.C. §§ 203(d) and 203(g), N.C. Gen. Stat. §§ 95-25.2(3), 95-25.2(5), and 95-25.2(18), and 20 C.F.R. §§ 655.103(b) and 655.1300(c).

13. At all times relevant to this Complaint, Plaintiff was engaged in commerce or in the production of goods for commerce, or was employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

3

## DEFENDANT

14. Defendant Fortino Ramirez Bautista a.k.a. Fortino R. Bautista ("Defendant" or "Defendant Ramirez") was registered as a Farm Labor Contractor ("FLC") with the U.S. Department of Labor ("USDOL"), including but not limited to in the year 2022.

15. Defendant's most current Farm Labor Contractor registration became valid on March 16, 2024, and it expires on March 15, 2026. That registration lists his residence as 3623 Reedsford Road in Clinton, North Carolina in Sampson County.

16. At all times relevant to this complaint, Defendant operated as an FLC, as defined by and in 29 U.S.C. § 1802(7), in that, for money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished, and/or employed migrant agricultural workers, including Plaintiff.

17. At all times relevant to this Complaint, Defendant was an employer of H-2A workers, including Plaintiff, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

## STATEMENT OF FACTS

Defendant's 2022 H-2A Program Participation

18. Defendant does not have his own fixed-site agricultural operation. As an H-2A Labor Contractor, Defendant furnishes H-2A labor to various farms.

19. In March of 2022, Defendant submitted an application for an H-2A Workforce ("2022 May Application") with a corresponding Agricultural and Food Processing Clearance Order ETA ("2022 May Order") and received approval to bring 292 H-2A workers to North Carolina to perform work in agricultural work, including the harvesting of blueberries and blackberries, from May 1, 2024 to November 25, 2022.

4

20. A true and correct copy of the 2022 May Order is labeled Exhibit A and filed concurrently with this Complaint.

21. In the 2022 May Order, Defendant certified his compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135 including assurances that Defendant would:

    a. Maintain accurate and adequate records with respect to each worker's earnings, records reflecting the nature and amount of work performed, the hours each worker worked each day, the rate of pay, and the amount of and reasons for any and all deductions taken from each worker's wages. 20 C.F.R. § 655.122(j);

    b. Pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period, 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

    c. Not seek or receive payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs. 20 C.F.R. § 655.135(j);

    d. Contractually prohibit in writing any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment of H–2A workers to seek or receive payments or other compensation from prospective employees. 20 C.F.R. § 655.135(k); and

    e. Comply with all applicable Federal, State and local laws and regulations, including, but not limited to, the FLSA, and the TVPRA, 20 C.F.R. § 655.135(e).

5

22. Defendant also certified that the 2022 May Application and Order contained all the material terms and conditions of the job.

23. Defendant verified the assurances contained in the 2022 May Application under penalty of perjury.

24. The terms and conditions of employment contained in 2022 May Order constituted the employment contract between the Defendant and the Plaintiff, the terms of which were supplied by federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

25. The applicable AEWR for North Carolina was $14.16 per hour, effective January 1, 2022. *See* 86 Fed. Reg. 71282 (Dec. 15, 2022).

26. The minimum daily subsistence amount to be paid to H-2A workers for food during their transportation from Mexico to the U.S. as published in the Federal Register was $14.00 per day in 2022, effective February 23, 2022. *See* 87 Fed. Reg. 10246 (February 23, 2022).

Foreign Recruitment of Plaintiff

27. In Mexico in 2022, Defendant utilized an individual named Jose Chavez ("Chavez") to recruit potential members of his H-2A workforce.

28. Upon information and belief, Chavez is Defendant's nephew.

29. In or around April 2022, Plaintiff was in Mexico when Chavez recruited him to work for Defendant pursuant to the 2022 May Order.

30. By and through his recruitment agent Chavez, Defendant made certain promises to Plaintiff including that the crew would be working on a visa in North Carolina for Defendant in different crops for several months, with work starting in the blueberry harvest, and that housing and transportation would be paid for by Defendant.

6

31. Chavez described his experience working for several seasons as a farmworker on Defendant's crew to Plaintiff. Chavez told Plaintiff that the work was plentiful, and that it was possible to make between $200 and $300 U.S. dollars a day, working seven days a week. Chavez also told Plaintiff that even on the days where there was not much work available, he could still expect to earn a minimum of $150 a day.

32. Chavez also communicated that he was currently a supervisor for Defendant's H-2A farm labor crew.

33. Chavez told Plaintiff that he would have to pay approximately 4,000 Mexican pesos for the visa related costs ("Visa Fee"), 60,000 Mexican pesos, or the equivalent of about $2,997 in U.S. dollars at that time, for the opportunity to work for Defendant in the U.S. ("Recruitment Fee"), and an additional 40,000 Mexican pesos deposit, or the equivalent of about $1998 in U.S. dollars at that time, to ensure Defendant that Plaintiff did not leave the contract early after his arrival in the United States ("Breach Fee").

34. Chavez initially told Plaintiff that he needed to pay the Visa Fee and the Breach Fee in Mexico, and to bring the Recruitment Fee in cash to pay Defendant when he arrived in the United States.

35. Chavez promised Plaintiff that Defendant would reimburse him the Breach Fee upon his successful completion of the work contract with Defendant.

36. Plaintiff accepted Defendant's offer of employment relying on Chavez's promises about the job and the wages he could earn. Plaintiff trusted Chavez because he was his neighbor.

37. Plaintiff paid Chavez the Visa Fee in-person in cash and Chavez did not provide Plaintiff a receipt.

38. A few days later, Plaintiff went to Chavez's home to learn of the details of the job. Chavez read aloud a document that he described as a contract to Plaintiff and other potential workers,

7

and then Chavez directed Plaintiff to sign the contract document and pay 1,000 Mexican pesos to him, which he did. Chavez did not provide Plaintiff a copy of the contract document, and Chavez did not provide a receipt.

39. Defendant failed to provide Plaintiff a copy of the work contract in a language he understands and failed to provide the contract prior to the time at which Plaintiff applied for the visa in violation of 20 C.F.R. 155.122(q).

40. Plaintiff then borrowed funds for the 60,000 Mexican peso Recruitment Fee, depleting a family member's savings, to have the funds to pay the fee upon his arrival to work for Defendant in the United States.

41. In Oaxaca, Chavez collected this money from Plaintiff and assisted Plaintiff in converting this money from Mexican pesos to U.S. dollars. Chavez returned the funds, now in U.S. currency, to Plaintiff so that Plaintiff could pay the fee in the U.S.

42. Also in Oaxaca, Chavez required Plaintiff to complete a questionnaire that included biographical information about his family members and their address in Mexico.

Travel from Home Country to Job Site

43. On or around May 14, 2022, at Chavez's instruction, Plaintiff and approximately 15 other workers met at Chavez's house in the state of Oaxaca to travel to the U.S. Consulate in Nuevo Laredo.

44. On the same day, Chavez instructed Plaintiff to sign a promissory note naming Teresa Consuelo Ramirez Sierra as the promisor of 40,000 Mexican pesos to Plaintiff. Plaintiff signed the promissory note because he did not have the savings to pay the Breach Fee "deposit" to Chavez prior to his departure from Mexico.

45. Upon information and belief, Teresa Consuelo Ramirez Sierra is Chavez's wife.

8

46. Plaintiff never actually received 40,000 Mexico pesos after signing the promissory note, but he understood that, by signing the note requiring him to pay the money to Chavez's wife under the terms of the note, that he had satisfied Defendant's Breach Fee payment requirement.

47. At Chavez's direction, the group departed the same day to travel to Nuevo Laredo. Chavez then collected 2,000 Mexican pesos from each worker, including Plaintiff, for their transport. Chavez did not provide Plaintiff a receipt.

48. When Plaintiff, Chavez, and the other workers arrived in Nuevo Laredo and their visas were processed, an individual identifying himself as an accountant working for Defendant informed Plaintiff and the other workers that they needed to pay 1,000 Mexican pesos to him get their visas. This fee was a surprise to Plaintiff. Plaintiff paid this fee in cash to the accountant who did not provide a receipt but did provide him with his passport with his H-2A visa.

49. Plaintiff and his coworkers traveled by taxi from the hotel where they received their visa to the border.

50. Plaintiff paid the $6 border crossing fee.

51. Defendant, by and through his agent Chavez, arranged for the Plaintiff and the other workers to be transported from the border to North Carolina in a overcrowded school bus. A law enforcement agent detained the bus in Texas. Plaintiff understood that the agent issued the driver a warning for transporting the workers in an unsafe manner.

Arrival in North Carolina

52. Defendant transported Plaintiff and other workers on Defendant's farm labor crew to Defendant's labor camp housing in the town of Garland in Bladen County, North Carolina. They arrived on or around May 18, 2022, at approximately 2:00 am or 3:00 am in the morning.

53. Defendant housed Plaintiff in a rural, geographically isolated labor camp compound ("Thunder Road Labor Camp"). The Thunder Road Labor Camp is comprised of multiple worker barrack buildings located about a half mile down an unpaved road and is not visible from the public road.

54. In 2022, the geographic area in which the Thunder Road Labor Camp is located lacked consistent coverage by most major cell phone companies. Plaintiff and the other workers housed there had to travel a great distance from the camp to successfully make a phone call, use an internet-based text or voice messaging service, or otherwise stably access information online.

55. During the first week of work in North Carolina, Chavez instructed the workers, including Plaintiff, to pay him the Recruitment Fee. Chavez told several workers, including Plaintiff, that they "have to start paying because they are asking me for the money."

56. At Chavez's instruction, Plaintiff and other workers went one-by-one to meet with Chavez in one of the worker barracks at the Labor Camp. Plaintiff paid Chavez the Recruitment Fee at this meeting.

57. Chavez did not provide Plaintiff with a receipt.

Plaintiff's Work and Compensation

58. Defendant initially assigned Plaintiff to harvest blueberries for one or various farms located short distances from the Thunder Road Labor Camp beginning on approximately May 18, 2022. During the first workweek, which, based on the best information available at this time, was from May 18, 2022 to May 21, 2022, Plaintiff worked approximately 53 hours.

59. On some workdays, Defendant arranged for Plaintiff to be transported to the blueberry fields in the morning and then required Plaintiff and other workers to wait for extended periods of

10

time at the worksite on the perimeter of the blueberry fields before the Defendant's supervisor directed them to begin harvesting.

60. Because of the isolated location of the blueberry fields and the requirement to be ready to begin harvesting in the field at any time, Plaintiff was not able to effectively use the time he waited for his own purposes during these wait times.

61. After a few initial weeks of work harvesting blueberries, Defendant then assigned Plaintiff to harvest blackberries.

62. Plaintiff worked approximately 53 hours in the first workweek and did not receive a check on May 21, 2022 at the end of the week for that work.

63. Plaintiff worked approximately 92.75 hours in the second workweek for Defendant.

64. At the end of the second workweek, on May 28, 2022, Defendant paid Plaintiff approximately $900 in cash and informed him that $200 of the $900 was allocated to a reimbursement for his Visa Fee and that the remaining $700 was allocated to his pay for his first two workweeks combined.

65. On each payday, Defendant, by and through an agent known as "Diesel," issued paychecks with paystubs to workers including Plaintiff and required them to sign the back of their checks and remit their signed checks back to him.

66. Then, Plaintiff and the other workers were required to tender the paystub to an individual known to Plaintiff to be Defendant's son who then paid Plaintiff a different, smaller amount than what was reflected on the paystub, in cash.

67. Defendant failed to pay Plaintiff at least the product of the FLSA federal minimum wage rate and their total hours worked for every workweek covered by this lawsuit.

68. Defendant failed to pay Plaintiff at least the product of the AEWR of $14.16 per hour and his total hours worked for every workweek covered by this lawsuit.

69. Since the AEWR was the wage promised by their employment contract and the H-2A regulations, Defendant thereby failed to pay Plaintiff at least the NCWHA promised wage for each work week covered by this lawsuit.

70. Defendant also failed to reimburse Plaintiff in his first paycheck for the fees he incurred in Mexico to get the job, including the various fees they had to pay to the Defendant's agents in Mexico, his inbound subsistence costs, border crossing fee, and transportation within Mexico.

71. These fees and travel-related expenses were deductions from Plaintiff's pay incurred primarily for the benefit of the Defendant.

72. Defendant's failure to reimburse Plaintiff for these deductions incurred primarily for the benefit of the Defendant in his first workweek brought Plaintiff's pay below the FLSA minimum wage and the NCWHA promised wage for that first week's wages.

Escalation of Defendant's Threats Against Plaintiff and Other Workers

73. When Defendant arranged on a weekly basis for Plaintiff and his coworkers to be transported into town to purchase food, Defendant's supervisor Diesel confiscated all of the workers' passports, including Plaintiff's, before they were allowed to make the trip to town and/or purchase food. Sometimes Diesel confiscated their passports upon their exit from the bus into to the store and, on other occasions, he confiscated their passports at the labor camp prior to their departure from the camp. Each week, when they returned to the Thunder Road Labor Camp after making their purchases in town, Diesel returned their passports.

74. For several weeks during the middle of the contract, Defendant failed to provide work to Plaintiff, and, as a result, Plaintiff received no income for these weeks.

75. Because Plaintiff felt pressure to repay the mounting debts he assumed for the opportunity to work for Defendant, Plaintiff was often not able to buy enough food to eat during those weeks in which he received no pay.

76. During one of the weeks that Defendant provided no work to Plaintiff, Defendant failed to transport Plaintiff to the store. Because Plaintiff had no independent means of transportation and out of concern for his mounting debts, Plaintiff had to borrow food from other workers. Also, Plaintiff and other workers resorted to hunting for rabbits near the labor camp to cook out of desperation to sustain themselves.

77. At the end of the first workweek, when Plaintiff and his coworkers were not paid for their work, a small group of workers escaped. After news of their escape circulated, Defendant convened the remaining workers together, including Plaintiff, and told them that some workers had left and that if they did that, he would report them to Immigration.

78. A few weeks after the first workers left, a larger group of workers escaped at night. The next morning, Defendant arrived at the Thunder Road Labor Camp brandishing a firearm. Defendant then instructed the workers including Plaintiff not to leave the camp. Defendant threatened that, if they left, Defendant would "find them out there." Defendant told them to "stop playing because I am waiting outside [the camps]." Plaintiff understood Defendant's actions and statements to be threats of harm to him should he try to leave the camp before the end of the contract.

79. Because of Plaintiff's indebtedness, directly caused by the unlawful fee he was illegally charged and Defendant's Breach Fee threatened should he leave the contract early, Defendant's failure to fully reimburse his travel expenses in his first paycheck, Defendant's failure to pay him his promised wages each workweek, and the inability to lawfully seek alternative

13

employment with some other employer, Defendant coerced Plaintiff to continue working for Defendant against his will.

80. Further, Plaintiff feared that, if he did leave or attempt to leave Defendant's employ, he would be deported or suffer physical harm at the hands of Defendant or his agents. In that case, he would not be able to repay the high debts he incurred in order to come work for Defendant.

Ongoing Work and Escape

81. Plaintiff left his employment with Defendant on July 6, 2022. At that point, Defendant failed to provide any work to him for about one and a half weeks and he grew increasingly desperate for food, concerned for his safety, and concerned that, even staying to the end of the contract, he would not be able to repay his mounting debts.

82. Later that same day, Defendant, by and through his agents, Chavez and his wife, began to contact Plaintiff in the U.S. and Plaintiff's wife in Mexico, to collect on the 40,000 peso promissory note Breach Fee that Plaintiff signed in Mexico, including accrued interest.

83. Chavez also contacted Plaintiff's sister in Mexico attempting to collect his outstanding payment of the Breach Fee for leaving Defendant's contract early.

84. Out of fear for his family's welfare in Mexico, Plaintiff borrowed money from other family members, and wired the money to his parents in Mexico. Plaintiff's parents then paid Chavez's wife. To Plaintiff's knowledge, the promissory note he signed was not returned to his parents to date.

**FIRST CLAIM FOR RELIEF**

(FAIR LABOR STANDARDS ACT: MINIMUM WAGE)

85. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

14

86. Plaintiff brings this claim for Defendant's violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

87. Plaintiff has consented in writing to bring this FLSA action.

88. A true and correct copy of the Plaintiff's FLSA Consent to Sue is labeled Exhibit B and is filed concurrently with this Complaint.

89. Defendant violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiff at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which he was employed.

90. Defendant willfully failed to fully reimburse Plaintiff during his first week of employment for expenses incurred primarily for the benefit of Defendant, including Plaintiff's inbound subsistence costs, visa fees, issuance of Form I-94, border crossing fee, and the full cost of travel from the place of recruitment to the jobsite, in violation of the FLSA.

91. When these expenses are calculated as deductions from his first week's pay, as required by law, they cause Plaintiff's first-week's wages to be less than the FLSA minimum wage.

92. Defendant required Plaintiff to incur approximately $3,445 in U.S. dollars in fees and travel costs, in violation of the FLSA.

93. When this fee is calculated as a deduction from the week they were required to remit the fee, it caused Plaintiff's wages for that week to be less than the FLSA minimum wage.

94. Defendant also failed to compensate Plaintiff at the minimum wage rate for all hours worked when Defendant failed to pay Plaintiff for each hour worked, in violation of the FLSA.

95. Defendant knew that he was required to pay Plaintiff at least the Federal minimum wage for each hour worked during a workweek. As such, Defendant's failure to pay Plaintiff the minimum wage was willful within the meaning of 29 U.S.C. § 255.

96. As a consequence of Defendant's willful violation of Plaintiff rights under the FLSA, Plaintiff seeks unpaid minimum wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF

(NORTH CAROLINA WAGE AND HOUR ACT)

97. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

98. Defendant failed to pay Plaintiff at least the promised wage of $14.16 for each hour or part of an hour that Plaintiff worked for Defendant for each workweek, in violation of N.C. Gen. Stat. § 95-25.6.

99. Defendant failed to reimburse Plaintiff during his first week of employment for expenses incurred primarily for the benefit of Defendant, including inbound subsistence costs, visa fees, issuance of Form I-94, the border crossing fee, and the full cost of travel from the place of recruitment to the jobsite. Defendant's failure to fully reimburse Plaintiff during the first workweek caused his first week's earnings to be less than the promised wage.

100. Defendant failed to compensate Plaintiff the promised wage for all hours worked by not paying him for all hours worked in every workweek.

101. Defendant required Plaintiff to incur approximately $3,445 in U.S. dollars in fees and travel costs, in violation of the FLSA. When this fee is calculated as a deduction from the week they were required to remit the fee, it caused Plaintiff's wages for that week to be less than the promised wage.

102. As a result of these actions, Defendant is in violation of Plaintiff's rights under N.C. Gen. Stat. §§ 95-26.6. Plaintiff has suffered damages in the form of unpaid wages and liquidated

16

damages that may be recovered from Defendant under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

## THIRD CLAIM FOR RELIEF

### (TVPRA – FORCED LABOR)

103.    Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

104.    Plaintiff brings this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) against Defendant for violations of 18 U.S.C. § 1589(a).

105.    Defendant knowingly threatened Plaintiff with serious harm, including physical, financial, reputational and legal harm, to obtain labor and services of Plaintiff.

106.    Defendant knowingly obtained Plaintiff's labor through abuse of the legal process by including false information in the 2022 May Order and thereby using the H-2A Program in a manner for which the law was not intended.

107.    Defendant also knowingly obtained Plaintiff's labor through abuse of the legal process by confiscating Plaintiff's passport thereby making Plaintiff susceptible to immigration consequences for not having their immigration documents.

108.    Defendant implemented a scheme, pattern or plan to cause to believe that he or his family would experience serious harm if he did not continue to work for Defendant. This scheme, pattern or plan included, but was not limited to, false promises, withholding documents, debt, and limiting Plaintiff's movements.

109.    For these violations, Plaintiff have suffered injuries and are entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

17

## FOURTH CLAIM FOR RELIEF

### (TVPRA – HUMAN TRAFFICKING)

110. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

111. Plaintiff brings this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C § 1595(a) against Defendant for violations of 18 U.S.C. § 1590.

112. 18 U.S.C. § 1590 provides that it is unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violations of laws prohibiting peonage, slavery, involuntary servitude, and forced labor" within the meaning of the provisions of the Trafficking Victims Protection Reauthorization Act.

113. Defendant, by and through his agents, knowingly recruited, provided, or obtained Plaintiff's labor by various fraudulent and/or coercive means including:

   a. Knowingly making false representations on the 2022 May Application and accompanying 2022 May Order submitted to USDOL for approval;

   b. Making fraudulent promises to Plaintiff regarding the terms of his working conditions in the U.S.;

   c. Designing to ensnare Plaintiff in debt in reliance on their promises of opportunity in furtherance of their trafficking scheme, whereupon the Defendant used this debt and threats towards Plaintiff and the other workers in a campaign of fear as a means of imprisoning Plaintiff;

   d. Confiscating and withholding Plaintiff's passport multiple times after his arrival to the U.S.; and

18

e.  Threatening Plaintiff, verbally, directly and indirectly, through his threatened acts of harm towards other workers in view of Plaintiff.

114.  Defendant intended to benefit from this trafficking scheme.

115.  Through these activities, Defendant knowingly recruited, transported, and harbored Plaintiff to obtain his labor or services by:

a.  Means of force, threats of force, physical restraint, or threats of physical restraint to Plaintiff or another person;

b.  Means of serious harm or threats of serious harm to Plaintiff or another person;

c.  Means of the abuse or threatened abuse of law or legal process; or

d.  Means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

116.  For these violations, Plaintiff has suffered injury and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

**FIFTH CLAIM FOR RELIEF**

**(TVPRA: UNLAWFUL CONDUCT IN RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING)**

117.  Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

118.  Plaintiff brings this civil claim pursuant to the civil remedy provisions of the TVPRA against Defendant for violations of 18 U.S.C. § 1592.

119.  Defendant knowingly removed and possessed Plaintiff's passport containing his H-2A visa.

19

120.    Plaintiff suffered injury as a result of this violation and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## SIXTH CLAIM FOR RELIEF

### (TVPRA: UNLAWFUL CONDUCT WITH RESPECT TO IMMIGRATION DOCUMENTS)

121.    Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

122.    Plaintiff brings this civil claim pursuant to the civil remedy provisions of the TVPRA against Defendant for violations of 18 U.S.C. § 1597.

123.    Defendant knowingly and with intent to defraud hired Plaintiff to work in North Carolina on an H-2A visa by making materially false promises or representations about the H-2A job opening.

124.    In the course of hiring Plaintiff to perform work in North Carolina on an H-2A visa based on false promises or representations, Defendant knowingly caused Plaintiff's passport to be confiscated and, by and through his agent, possessed Plaintiff's passport.

125.    For these violations, Plaintiff have suffered injury and is entitled to recover damages, including punitive damages and attorneys' fees, pursuant to 18 U.S.C. § 1595(a).

## SEVENTH CLAIM FOR RELIEF

### (BREACH OF CONTRACT)

126.    Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference. Defendant breached his contractual duty to Plaintiff to pay all wages owed to Plaintiff when those wages were due, as required by the terms of the 2022 May Order described above in this Complaint, and further described in and by 20 C.F.R. §§ 655.122, 655.1304, and 655.1305.

127. Defendant offered employment on the terms and conditions set out in the 2022 May Application and accompanying 2022 May Order.

128. Plaintiff accepted Defendant's offer.

129. Defendant breached the employment contract with Plaintiff by providing terms and conditions of employment that were materially different from those in the 2022 May Order including, but not limited to:

    a. Defendant failed to pay Plaintiff at least the promised minimum hourly wage, or the AEWR, of $14.16 for each compensable hour of work in a workweek;

    b. Defendant failed to pay Plaintiff at least the applicable Federal minimum wage for each compensable hour of work in a workweek;

    c. Defendant failed to provide reimbursement for visa and inbound transportation expenses;

    d. Defendant failed to accurately record hours worked;

    e. Defendant charged a recruitment fee; and

    f. Defendant charged a breach fee.

130. Defendant's breach of the employment contract with Plaintiff caused substantial injuries.

131. Defendant is liable to Plaintiff for the damages that arose naturally and according to the usual course of things from Defendant's breach, as provided by federal common law and/or North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

## **JURY DEMAND**

132. Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Honorable Court enter an order:

(a) Finding that this Court has jurisdiction over Plaintiff's claims;

(b) Granting a jury trial on all issues so triable;

(c) Declaring that Defendant, by the acts and omissions describe above, willfully violated Plaintiff's rights under the f the FLSA as set forth in Plaintiff's First Claim for Relief;

(d) Granting judgment in favor of Plaintiff on his FLSA claims and awarding Plaintiff monetary damages for unpaid minimum wages and unpaid overtime, plus liquidated damages in an equal amount and interest, costs, and attorneys' fees, as provided by 29 U.S.C. § 216(b);

(e) Declaring that Defendant, by the acts and omission described above, violated Plaintiff's rights under the North Carolina Wage and Hour Act, as set forth in Plaintiff' Second Claim for Relief.

(f) Granting judgment in favor of Plaintiff on his NCWHA claims and awarding Plaintiff monetary damages for unpaid minimum wages, plus liquidated damages in an equal amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.6.

(g) Declaring that Defendant, by the acts and omissions described above, violated Plaintiff's rights under the TVPRA at 18 U.S.C. §§ 1589, 1590, 1592, and 1597 as set forth in Plaintiff's Third, Fourth, Fifth, and Sixth Claims for Relief.

(h) Granting judgment in favor of Plaintiff for each of his TVPRA claims and awarding the amount of his damages, including actual and punitive damages, and attorneys' fees as provided by 18 U.S.C. § 1595(a);

22

(i) Declaring that Defendant violated Plaintiff's rights under the common law of contracts as set forth in Plaintiff's Seventh Claim for Relief;

(j) Granting judgment in favor of Plaintiff for his breach of contract claim based on the common law of contracts and awarding compensatory damages as set forth in Plaintiff's Seventh Claim for Relief;

(k) Awarding Plaintiff pre- and post-judgment interest, as allowed by law;

(l) Awarding Plaintiff his costs; and

(m) Granting such injunctive, declaratory, and further relief as this Court deems just and appropriate.

This the 14th day of May 2024.

Respectfully submitted,

/s/ Megan Garcia-Davis
Megan Garcia-Davis
N.C. State Bar No. 58958
Legal Aid of North Carolina, Inc.
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Phone: (919) 856-2180
Email: MeganG@legalaidnc.org

Attorney for Plaintiff

23